IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| ABEL MENDOZA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. NO. 3:11-cv-390 |
| | § | |
| | § | |
| CITY OF PALACIOS | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.     STATEMENT OF FACTS**

Plaintiff, Abel Mendoza, was hired by the City of Palacios in March of 2008 as

a Patrol Officer.  Exhibit 2 at 2.

On August 7, 2009, Mr. Mendoza was given a note from his doctor stating that

he should not return to work until August 10, 2009, because his blood pressure was

extremely elevated.  *Id.* and Exhibit C to Defendant's Motion for Summary Judgment.

Mr. Mendoza brought the note to his supervisor at the City on August 7, 2009.  *Id.*

Mr. Mendoza was then off work on August 8 and 9, 2009, as ordered by his

doctor, and then off on his regular days on August 10 and 11.  *Id.*

When Mr. Mendoza returned to work on August 12, he was called into the office

1

of the Police Chief, David Miles. *Id.* When Mr. Mendoza arrived at Chief Miles'

office, Chief Miles angrily demanded that Mr. Mendoza resign his employment with

the City. Declaration of Abel Mendoza (Exhibit 4) at 1. Chief Miles held up Mr.

Mendoza's doctor's note that stated that Mr. Mendoza would need to be off work

because of his hypertension, told Mr. Mendoza that it was "bullshit," and said he

wanted Mr. Mendoza's resignation immediately. *Id.*

Mr. Mendoza then attempted to speak with Chief Miles about his hypertension,

but Chief Miles cut him off. Exh. 4 at 1. Chief Miles appeared angry and was yelling

at Mr. Mendoza. *Id.*

Though Mr. Mendoza did not want to resign, he felt that he had no choice. *Id.*

Mr. Mendoza told Chief Miles that he would have his resignation that day. *Id.* Chief

Miles did not tell Mr. Mendoza that he did not want him to resign, or that he would not

accept Mr. Mendoza's resignation. *Id.* In fact, he made no statement in response to

Mr. Mendoza telling him that he would have his resignation that day. *Id.* Mr.

Mendoza believed, based on Chief Miles' demeanor, his angry and loud tone of voice,

and the words that he said during the meeting that he would have been fired if he had

not submitted his resignation letter. *Id.* at 2.

Following the altercation with Chief Miles, Mr. Mendoza went to the patrol

office and typed up his letter of resignation. *Id.* When Mr. Mendoza gave Chief

Miles the resignation letter after he typed it up, Chief Miles took it, clipped the doctor's note to it, and said "ok."  *Id.*  He did not ask Mr. Mendoza any questions about it, or tell Mr. Mendoza he did not want him to resign.  *Id.*

Following Mr. Mendoza's separation from employment, Chief Miles signed an exit interview form for Mr. Mendoza which states that Mr. Mendoza's "resignation was demanded for health issues - high blood pressure." Exh. 1.  Chief Miles testified that he signed the form after Mr. Mendoza wrote that he his "resignation was demanded for health issues - high blood pressure" on the form.  Exhibit 7 (Deposition of David Miles) at 34:25-35:23.

Mr. Mendoza filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission on September 17, 2009.  Exhibit 2.  He also filed for unemployment benefits, which he received after a hearing and subsequent appeal to the Texas Workforce Commission's Appeal Panel.  Exhibit 3.  The Appeal Panel found that "in demanding [Mr. Mendoza's] resignation, the Chief of Police was clearly sending the message that if [Mr. Mendoza] did not submit his resignation, he would be discharged."  Exhibit 3 at 2.  The Appeal Panel also found that Mr. Mendoza "was discharged for absences due to a medical condition."  Exhibit 3.  Mr. Mendoza's Notice of Right to Sue was sent to him on May 26, 2011 (Exhibit 5), and he filed this lawsuit on August 22, 2011.

## II.    ARGUMENT

### A.    Mr. Mendoza was "regarded as" disabled.

Defendant's Motion for Summary Judgment argues first that Plaintiff does not meet the definition of "disabled" under the ADA or the TCHRA[1]. Defendant's arguments are based on a mis-reading of the ADA and on case law that pre-dates the Americans with Disabilities Act Amendments Act ("ADAAA") of 2008.

Congress amended the Americans with Disabilities Act in 2008 with the stated purpose of making it "easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. §1630.1(c)(4). The regulations promulgated under the Amendments Act provide that  "Consistent with the Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the definition of ''disability'' in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA."  *Id.*

Accordingly, "[t]he primary object of attention in cases brought under the ADA should be ***whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of***

---

[1]    The ADA and the TCHRA prohibit disability discrimination, and Texas courts follow analogous federal precedent in interpreting the TCHRA. *Bleak v. Providence Health Center,* 2011 WL 6371802, *2 (5th Cir.2011), *citing NME Hosps., Inc. v. Runnels,* 994 S.W.2d 142, 144 (Tex.1999). Thus this Court applies the legal standards for the ADA to resolve the TCHRA claim. *Id., citing Rodriguez v. ConAgra Prods. Co.,* 436 F.3d 468, 473–74 (5th Cir.2006); *Carroll v. Sanderson Farms, Inc.*, CIV.A. H-10-3108, 2012 WL 3866886 (S.D. Tex. Sept. 5, 2012)

***disability.*** The question of whether an individual meets the definition of disability under this part should not demand extensive analysis." *Id.* (emphasis supplied).

Under the ADAAA, a plaintiff may establish that she is "disabled" by demonstrating "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

The regulations promulgated under the ADAAA instruct employees to utilize the third definition - "regarded as" - where disability discrimination is alleged, but reasonable accommodation for the disability is not an issue. 29 C.F.R. §1630.2(g)(3). The regulations state that it is unnecessary for the plaintiff "to proceed under the 'actual disability' or 'record of' prongs,' which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment." 29 C.F.R. §1630.2(g)(3).

The regulations further explain that "Congress expected the first and second prongs of the definition of disability ''to be used only by people who are affirmatively seeking reasonable accommodations." *See* Appendix to 29 C.F.R. Part 1630—Interpretive Guidance on Title I of the Americans With Disabilities Act (attached hereto as Exhibit 6) at p. 17006[2]. Thus, according to the Interpretive

---

[2] Citations to the Interpretive Guidance issued under the final Americans with Disabilities Amendments Act Regulations are to the page number in the Federal Register report in which the

Guidance, ''[a]ny individual who has been discriminated against because of an *impairment*—short of being granted a reasonable accommodation — *should be bringing a claim under the third prong of the definition which will require no showing with regard to the severity of his or her impairment.*'' *Id.* (quoting Joint Hoyer-Sensenbrenner Statement at 4)(emphasis supplied). An "impairment" is defined as "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular . . ." 29 C.F.R. §1630.2(h).

As Mr. Mendoza did not seek (or require) any accommodation for his disability, he is proceeding under the third, "regarded as," prong.

For "regarded as" claims, an individual is no longer required to demonstrate that the disability she is regarded as having is an actual qualified disability under the ADA or that it substantially limits a major life activity. See 42 U.S.C. §§ 12102(1)(C), (3). Under the ADAAA, "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* The regulations also re-affirm that the "regarded as"

---

Interpretive Guidance was published.  The Federal Register report is attached hereto as Exhibit 6.

prong does not require a showing of an impairment that substantially limits a major life activity.  29 C.F.R. §1630.2(g)(3).

Under the regulations, "coverage under the 'regarded as' prong of the definition of disability should not be difficult to establish." *See* Exhibit 6 at p. 17014 (*citing* 2008 House Judiciary Committee Report at 17 (explaining that Congress never expected or intended it would be a difficult standard to meet)). Under the third prong of the definition of disability, an individual is "regarded as having such an impairment" if the individual is subjected to an action prohibited by the ADA because of an actual or perceived impairment that is not "transitory and minor." 29 C.F.R. 1630.2(g)(3).

The ADA Amendments Act broadened the application of the "regarded as" prong of the definition of disability. Exhibit 6 at 17014 (*citing* 2008 Senate Statement of Managers at 9–10).  In doing so, Congress rejected court decisions that had required an individual to establish that a covered entity perceived him or her to have an impairment that substantially limited a major life activity.  *Id.*  "This provision is designed to restore Congress's intent to allow individuals to establish coverage under the "regarded as" prong by showing that they were treated adversely because of an impairment, without having to establish the covered entity's beliefs concerning the severity of the impairment." *Id.* (*citing* Joint Hoyer- Sensenbrenner Statement at 3).

Thus, there is no need in this case for Mr. Mendoza to show what the City (or,

more specifically, Chief Miles) believed about his hypertension.  *Id.*  Mr. Mendoza

need only show that he was treated adversely because of the impairment to meet the

definition of having been "regarded as" disabled.  *Id.*  It cannot be disputed that

hypertension meets the definition of an "impairment" of the "cardiovascular" system,

such that it satisfies the definition contained in 29 C.F.R. §1630.2(h).

The lone example contained in the ADAAA Interpretive Guidance for how to

establish a "regarded as" claim applies easily to the facts in this case.  The Guidance

states:

> To illustrate how straightforward application of the
> "regarded as" prong is, if an employer refused to hire an
> applicant because of skin graft scars, the employer has
> regarded the applicant as an individual with a disability.

Exhibit 6 at 17014-17015.  In such a case, there need be no showing that the applicant

was hindered in any way because of the scars, or even that the scars were visible.  The

applicant does not have to show that the employer believed that he would be prevented

from or hindered in his job by the scars, or that the scars made other people

uncomfortable.

In this case, substituting "high blood pressure" for "skin graft scars" and

"terminated an employee" for "refused to hire an applicant" yields the same result: by

terminating Mr. Mendoza because of his high blood pressure, the City cannot avoid a

finding that it regarded Mr. Mendoza as disabled under the ADAAA.  It is sufficient,

for purposes of establishing that an employee is "regarded as" disabled, to show that the employer took action against the employee because of his impairment.  As there is ample evidence demonstrating that is what occurred in this case, summary judgment on the question of whether Mr. Mendoza is "disabled" under the ADAAA is improper.

### B.      No requirement to show "substantially limited."

Defendant also argues at p. 5 of its Motion that Mr. Mendoza is not disabled because there is no evidence that he has a "mental or physical impairment that substantially limits one or more major life activities."  Def. Motion at 5.  As discussed above, the ADAAA expressly rejected this requirement for a "regarded as" claim.  The regulations state that "[w]hether an individual's impairment "substantially limits" a major life activity is not relevant to coverage under paragraph (g)(1)(iii) (the "regarded as" prong) of this section."  29 U.S.C. §1630.2(j)(2).  As Mr. Mendoza need not show that he was "substantially limited" or perceived to be substantially limited in a major life activity, summary judgment on this ground should be denied.

### C.      Mr. Mendoza was subjected to an adverse employment action because of his impairment.

#### 1.      Mr. Mendoza was subjected to an adverse employment action.

The City argues that Mr. Mendoza's claims in this case fail because he was not subjected to an "adverse employment action" because he resigned his position instead of being fired.  Def. Motion at 6.  However, courts in this district have long recognized

that being forced to resign from a position is an adverse employment action. *See, e.g., Matthews v. GEICO*, CIV.A. H-09-CV-609, 2010 WL 1644713 (S.D. Tex. Apr. 23, 2010);

This Court and other Texas federal courts have treated resignations given in lieu of terminations as adverse employment actions. *See, e.g., Ibrahim v. City of Houston,* 2009 WL 1011193, 14–15 (S.D. Tex. Apr 15, 2009) (treating a resignation in lieu of termination as an adverse employment action); *McCoy–Eddington v. Brazos County,* 2007 WL 1217989, at *1 (S.D.Tex. Apr.24, 2007) (same); *Vicari v. Ysleta Indep. Sch. Dist.,* 546 F.Supp.2d 387, 413 (W.D.Tex.2008) ("The Court concludes recommending non-renewal of [the plaintiff's] contract sufficiently qualifies as an adverse employment action, although [the plaintiff] subsequently resigned her employment at the TEA hearing."); *Denner v. Tex. Dep't of Criminal Justice,* 2006 WL 2987719, at *3 (W.D.Tex. Oct.16, 2006) (finding that there was enough evidence for a jury to decide that plaintiff had suffered an adverse employment action, where plaintiff resigned ahead of termination and termination appeared certain); *Buster v. Dallas County Hosp. Dist.,* 1998 WL 460284, at *2 (N.D.Tex. July 24, 1998) (treating a resignation in lieu of termination as an adverse employment action). The Fifth Circuit has also recognized that a plaintiff may make out a claim of constructive discharge by demonstrating that he was forced to choose between resignation and termination. *Faruki v. Parsons,* 123

F.3d 315, 318 (5th Cir.1997).

As the facts cited above demonstrate, Mr. Mendoza did not want or intend to resign his employment with the City.  Exh. 4 at 1-2.  However, following Chief Miles angry rant and his demand of Mr. Mendoza's resignation, Mr. Mendoza thought, reasonably, that he had no choice but to resign.  Chief Miles' angry words and demeanor, combined with his hostile rejection of Mr. Mendoza's doctor's note, would allow a reasonable fact-finder to determine, as the Texas Workforce Commission did, that Mr. Mendoza was forced to resign his position with the City.  As there exists a genuine issue of material fact as to whether Mr. Mendoza was forced to resign, summary judgment is inappropriate on the question of whether Mr. Mendoza was subjected to an adverse employment action.

### 2.    Evidence that the impairment was the cause of the termination

Courts have recognized the difficulty and inappropriateness of determining a "regarded as" claim on summary judgment.  As the Sixth Circuit found in *Ross v. Campbell Soup Co.,* "where there is substantial evidence that an individual's medical status played a significant role in an employer's decision to fire that individual," and that evidence is combined with evidence of pretext, "the need for more extensive factual inquiry into whether the employer engaged in unlawful discrimination is especially acute," and there will be a fact issue as to the company's state of mind

regarding the plaintiff's condition. *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001). The *Ross* court further explained that "[u]nder the 'regarded as' prong of the ADA, membership in the protected class becomes a question of intent. And ... that question-*i.e.,* the employer's motive-is one rarely susceptible to resolution at the summary judgment stage." *Watts v. United Parcel Serv.*, 378 F. App'x 520, 530 (6th Cir. 2010)(citing *Ross*, 237 F.3d at 706). The Sixth Circuit later applied a similar reasoning in finding that the plaintiff was "regarded as" disabled in *Moorer v. Baptist Mem'l Health Care Sys.,*, in which the court denied summary judgment on grounds that "there is substantial evidence that Moorer's medical status played a significant role in Baptist's decision to fire him." *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 481 (6th Cir. 2005).

Based on the exchanges that took place during Mr. Mendoza's termination meeting, a reasonable fact-finder could conclude that Mr. Mendoza was terminated because of his hypertension - an "actual or perceived physical impairment." *Id.* The doctor's excuse Mr. Mendoza presented to the city expressly stated that it was for his hypertension, and there is no dispute that Chief Miles reviewed the statement prior to terminating Mr. Mendoza, as he was holding it up for Mr. Mendoza to see when he demanded Mr. Mendoza's resignation.

While Chief Miles denies referring to Mr. Mendoza's doctor's note as "bullshit"

and then demanding Mr. Mendoza's resignation, Mr. Mendoza's testimony regarding the conversation must be credited on summary judgment. The inquiry is then whether a reasonable fact finder could infer from this statement that Chief Miles terminated Mr. Mendoza because of his medical condition, i.e. because he regarded him as disabled. There are, to be sure, various inferences that can be drawn from Chief Miles' remarks. One that is reasonable is that Chief Miles was angry at Mr. Mendoza for having a medical condition that necessitated him taking time off from work. The City does not allege that the absence was a violation of policy, so there was nothing wrong with the absence itself, and Chief Miles never indicated that the absences were a problem. A reasonable fact-finder could thus determine that it was the underlying cause of the absence that caused Chief Miles to demand Mr. Mendoza's resignation.

There are several pieces of evidence that further support such an inference. First, there is Chief Miles' signature on Mr. Mendoza's exit interview form which states that Mr. Mendoza's "resignation was demanded for health issues - high blood pressure." Exh. 1. Chief Miles testified that he signed the form after Mr. Mendoza wrote that he his "resignation was demanded for health issues - high blood pressure" on the form. Exhibit 7 (Deposition of David Miles) at 34:25-35:23.

Second, there is ample evidence from which a fact-finder could determine that Chief Miles viewed Mr. Mendoza's condition as a hinderance to his job. Chief Miles

testified that he was concerned that Mr. Mendoza's condition could "incapacitate[] his ability to perform his job" such that he would have to notify someone with the City if he was needing to have his blood pressure checked with he was on duty.  Exhibit 7 at 11:21-12:18.  Chief Miles criticized Mr. Mendoza for failing to notify his supervisor of his high blood pressure and need to get it checked (*id* at 13:16-20), as it could have been something that could be a "hazard to him or incapacitates his ability to perform his job" (*id.* at 11:21 to 12:18) or "something that -- you know, like I said, that creates an impairment or something that creates a danger to him or his job or whatever . . ." *Id.* at 12:23 to 13:10.  Chief Miles' misperception of Mr. Mendoza's ability to effectively perform his job further demonstrates that he regarded him as disabled, and would allow a reasonable fact-finder to determine that Mr. Mendoza was terminated because of his condition.

### D.  Defendant failed to articulate a legitimate, non-discriminatory reason for Mr. Mendoza's termination

The last section of Defendant's Motion for Summary Judgment is entitled "Burden Shifting," and discusses Defendant's burden to articulate a legitimate reason for its adverse action against the plaintiff, and the shift of the burden back to plaintiff to demonstrate that such an articulated reason was pretext.  Defendant has failed to meet this burden, as its only claim in this section is that Mr. Mendoza resigned his employment with the City.  As a fact issue has already been shown to exist with respect

to this contention, it should be rejected.   However, even if this can be seen as Defendant's allegedly legitimate reason for the termination of Mr. Mendoza's employment, Mr. Mendoza has already set forth ample evidence from which a fact finder could conclude that it is incorrect, and that the true reason for his separation from employment was Chief Miles' decision that Mr. Miles should no longer be employed with the City because of his hypertension.

## III.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.

Respectfully submitted,

**TERRY, SIMON & KELLY**
701 Brazos Street, Suite 500
Austin, Texas 78701
(512) 391-1955 Telephone
(512) 588-1726 Facsimile

/s/  Kell A. Simon
Kell A. Simon
State Bar No. 24060888

ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

By my signature hereunder affixed, I certify that a true and correct copy of the foregoing document has been transmitted to all parties of record **the Court's CM/ECF system**, on this 10th  day of May, 2013, addressed as follows:

W. Clayton Cain
Cullen, Carsner, Seerden, & Cullen, L.L.P.
P.O. Box 2938
Victoria, TX 77902-2938

/s/ Kell A. Simon
Kell A. Simon